MICHAEL J. SKRYP,                  )
                                   )
        Plaintiff,                 )
                                   )
        vs.                        )    Civil Action No. 03-157
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
        Defendant.                 )

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Michael J. Skryp and Defendant Michael
J. Astrue, Commissioner of Social Security.¹  Plaintiff seeks
review of a final decision by the Commissioner denying his claim
for disability insurance benefits ("DIB") under Title II of the
Social Security Act, 42 U.S.C. §§ 401 *et seq.*  For the reasons
discussed below, Defendant's motion is denied, Plaintiff's motion
seeking an immediate award of benefits is denied, and the matter is
remanded for further consideration.

---

¹  Pursuant to Fed. R. Civ. P. 23(d)(1), Michael J. Astrue, who
became Commissioner of Social Security on February 12, 2007, is
substituted for Jo Anne B. Barnhart in this action; *see also* 42 U.S.C.
§ 405(g) ("Any action instituted in accordance with this subsection
shall survive notwithstanding any change in the person occupying the
office of Commissioner of Social Security or any vacancy in such
office.")

## II. **BACKGROUND**

### A. Factual Background

On May 29, 1990, Plaintiff Michael J. Skryp injured his back while working as a laborer for Pittsburgh Nipple and Conduit Company, where his duties included bending, cutting and threading pipe, driving a forklift, and moving barrels of pipe. Initially, he received only conservative treatment and soon returned to work. However, his condition did not improve and his neurosurgeon, Robert Baker, performed a microlumbar discectomy, L4-L5, L5-S1, on March 19, 1991. (Transcript of Proceedings, Docket No. 7,[2] "Tr.," 167-169.)

Dr. Baker released Plaintiff to return to work on May 23, 1991, with several restrictions on lifting, bending, and driving, and noted he had advised Mr. Skryp that he should be "retrained for a non-manual position for his long-term health and long-term job employability." (Tr. 394.) By August 1991, Dr. Baker anticipated that within the next few months Plaintiff could return to work without restrictions. (Tr. 392.) However, when he tried to work part time in early September, radicular[3] leg pain returned for the first time since his surgery, along with spasms in his lumbo-sacral

---

[2] *See also* Docket No. 11 for Tr. 115, 304 and 323 which were inadvertently omitted from Docket No. 7.

[3] "Radicular pain" refers to pain relating to or involving a nerve root. See the medical dictionary at the National Institute of Medicine's on-line website, Medline Plus, at www.nlm.nih.gov/ medlineplus (last visited November 16, 2007), "Medline Plus."

2

spine and numbness in his left leg. Dr. Baker was negative about Plaintiff's ability to return to his former employment in the near- or long-term future. (Tr. 390.)

On September 13, 1991, Mr. Skryp was injured in a vehicle accident at work (Tr. 360, 389) which exacerbated his back pain; Dr. Baker refused to allow him to return to work and prescribed medication, heat treatments, stretching exercises, and physical therapy. Dr. Baker again urged him to undergo re-training for non-manual work. (Tr. 387.) As of November 1991, returning to his former position was no longer an option because the company had laid-off all its employees and Mr. Skryp began looking for other jobs. (Tr. 386, 384.) By June 1992, Dr. Baker concluded that Plaintiff's neurological condition was normal and that he had done "extremely well" following his surgery, despite the effects of the accident. Although he could not return to heavy labor, he could "be gainfully employed with a light to moderate duty job" and could return to such a position "as soon as possible." He was released from Dr. Baker's care with instructions to return on an as-needed basis. (Tr. 383.)

On April 30, 1993, Mr. Skryp was in another accident when his car was struck from behind. His back pain recurred and within two days was described as "rather severe." Plaintiff returned to Dr. Baker who diagnosed his condition as an acute lumbar strain. (Tr. 369, 382.) Following another back injury in June, Dr. Baker

3

suspected he had probably re-herniated the nucleus pulposus[4] at L-4-5 on the left and recommended that he "should seriously consider repeat myelography."[5]  (Tr. 380.)

Dr. Robert Durning examined Mr. Skryp on January 10, 1994, and subsequently advised the disability claims adjudicator at the Pennsylvania Bureau of Disability Determination that Plaintiff was not able to perform any more than part-time sedentary work due to his "'semi-acute' low back derangement."  (Tr. 372.)

Following his back injuries and loss of his job as a pipe bender, Mr. Skryp attempted to return to work on several occasions. From November 1995 to January 1996, he worked for a company manufacturing torch tips, a job which involved using a micrometer and drill press.  (Tr. 279; 281.)  In December 1997, he worked in a temporary position as a mail clerk for the U.S. Postal Service. (Tr. 279; 283.)  During the summers of 1996, 1998, and 1999, he worked intermittently as a janitor for a public school system. (Tr. 279; 282.)  In each instance, according to Plaintiff, he was limited in his ability to perform the work satisfactorily due to his physical condition.  (Tr. 567; 275.)

---

[4]  The nucleus pulposus is "an elastic pulpy mass lying in the center of each intervertebral fibrocartilage."  *See* medical dictionary at Medline Plus.  A "herniated nucleus pulposus" is commonly referred to as a ruptured or prolapsed disc.  *See* Moody v. Barnhart, No. 03-3246, 2004 U.S. App. LEXIS 23885, *6 (3d Cir. Nov. 16, 2004).

[5]  Myelography is "the radiographic visualization of the spinal cord after injection of a contrast medium into the spinal subarachnoid space."  *See* medical dictionary at Medline Plus.

4

## B.    Procedural Background

On December 7, 1990, Mr. Skryp filed an application for
Social Security disability insurance benefits which was denied
initially and upon reconsideration.  (Tr. 56-65.)  Following a
hearing before an administrative law judge ("ALJ") on October 31,
1991, denial of Mr. Skryp's application was affirmed in a decision
dated January 28, 1992 (Tr. 212-219); Plaintiff apparently did not
appeal this denial to the district court level.

Plaintiff filed a second application for DIB and Supplemental
Security Income ("SSI") benefits on November 1, 1999, again
claiming disability as of May 29, 1990, the date of his initial
injury.  (Tr. 235-237.[6])  Following denial of both applications
(see Tr. 223-226), a hearing was held before Administrative Law
Judge James Bukes on October 17, 2001.  Judge Bukes issued a
partially favorable decision on November 27, 2001, in which he
found that as of November 1, 1999, Plaintiff was unable to perform
even sedentary work and was therefore entitled to SSI benefits as
of that date.[7]  However, the ALJ also found that Mr. Skryp was not
disabled at any time prior to Plaintiff's date last insured

---

[6]  The application for SSI, initial disability determination on
February 23, 2000, and the SSI notice dated March 1, 2000, are missing
from the record.  (See Tr. 7.)  Neither party raises any issues
regarding these documents and the Court finds them irrelevant to the
resolution of this matter.

[7]  Neither party disputes this portion of Judge Bukes's first
decision.  Although the ALJ was directed by the Appeals Council to
reconsider both applications, he focused on the unfavorable decision
regarding disability insurance benefits; this Court will do the same.

("DLI"), December 31, 1998, and was therefore not entitled to disability insurance benefits. (Tr. 495-509.)

Plaintiff timely appealed the unfavorable portion of Judge Bukes's decision to the Social Security Appeals Council. (Tr. 514-516.) The Appeals Council affirmed that decision (Tr. 517-518), and Plaintiff appealed to the United States District Court for the Western District of Pennsylvania on May 9, 2003. Upon motion of the Commissioner, the Court remanded the case for re-consideration because the audiotape of the hearing in October 2001 could not be located. (Tr. 521; Docket No. 4.) Upon remand, the Appeals Council issued an order to the ALJ on December 17, 2003, stating in relevant part,

> The [ALJ] will give the claimant the opportunity to submit additional evidence including updated medical reports and functional assessments from the claimant's treating physicians that are available for the pertinent period at issue. The [ALJ] will give full consideration to the claimant's treating physicians and other opinion evidence in accordance with 20 C.F.R. §§ 404.1527(d) and 416.926 and Social Security Rulings (SSR) 96-2p, 96-3p, and 96-5p. . . .
>
> The [ALJ] shall reassess the claimant's impairments pursuant to Social Security Ruling 02-1p.
>
> The [ALJ] will provide the claimant an opportunity to appear at a *de novo* hearing, develop the record pursuant to 20 C.F.R. §§ 404.1512-404.1518 and/or 416.912-416-918, and issue a new decision.

(Tr. 521-522.)

Pursuant to this order, the record was supplemented and a second hearing held on September 14, 2004, again before Judge

6

Bukes, at which Plaintiff was represented by counsel. In his decision, issued on February 24, 2005, the ALJ found that Plaintiff was not disabled at any time prior to his DLI. (Tr. 28-42.) Following two requests by Plaintiff for extensions of time in which to present his objections to Judge Bukes's opinion, the Appeals Council declined jurisdiction on October 19, 2006. (Tr. 10-11.) Therefore, the February 24, 2005 opinion of the ALJ became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000).

On March 19, 2007, the Court granted the Commissioner's motion to re-open the case (Doc. Nos. 5 and 8), and the parties subsequently filed cross-motions for summary judgment.

C.  Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

**III. STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to

support the Commissioner's findings of fact. 42 U.S.C. § 405(g);
Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of
Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of
fact by the Commissioner are considered conclusive if they are
supported by "substantial evidence," a standard which has been
described as requiring more than a "mere scintilla" of evidence,
that is, "such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion." Richardson, id. at 401. "A
single piece of evidence will not satisfy the substantiality test
if the [ALJ] ignores, or fails to resolve, a conflict created by
countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d
Cir. 1983).

This Court does not undertake *de novo* review of the decision
and does not re-weigh the evidence presented to the Commissioner.
Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006),
*citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d
Cir. 1986) (the substantial evidence standard is deferential,
including deference to inferences drawn from the facts if they, in
turn, are supported by substantial evidence.) If the decision is
supported by substantial evidence, the Court must affirm the
decision, even if the record contains evidence which would support
a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004
U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds
v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel,

8

228 F.3d 259, 262 (3rd Cir. 2000).

## IV. LEGAL ANALYSIS

### A. The ALJ's Determination

In determining whether a claimant is eligible for Social Security disability benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[8] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).

A claimant for DIB must also show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Mr. Skryp satisfied the first two non-medical requirements, and the parties agree that Plaintiff's date last insured was December 31, 1998. Therefore, in order to receive DIB, Mr. Skryp must show that he became disabled prior to that date.

---

[8] According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

To determine a claimant's rights to benefits,[9] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity[10] ("RFC") to perform his past relevant work, he is not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 404.1520; see also Morales, 225 F.3d at 316.

In steps one through four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts

---

[9] The same test is applied whether the claimant is seeking DIB or SSI benefits. Burns v. Barnhart, 312 F.3d 113, 119, n1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both types of claims.

[10] Briefly stated, residual functional capacity, or RFC, is what a claimant can do despite his recognized limitations. Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule." See also 20 C.F.R. § 404.1545.

to the Commissioner to show that the claimant is capable of performing work which is available in the national economy. Gorecki v. Massanari, 197 F. Supp.2d 154, 159 (M.D. Pa. 2001), *citing* Fargnoli v. Massanari, 247 F.3d 34, 39 (3d Cir. 2001).

Following the prescribed analysis, Judge Bukes first concluded that Mr. Skryp had not engaged in substantial gainful activity since his alleged onset date of May 29, 1990.[11]  (Tr. 30.)  At step two, he found that during the period at issue, May 29, 1990, through December 31, 1998, Plaintiff suffered from back problems with a history of surgery to his lower back, depression, borderline intellectual functioning, and obesity, all of which were severe as that term is defined by the Social Security Administration ("SSA.") (Tr. 30.)

At step three, the ALJ concluded that Mr. Skryp's "back problems do not even approach meeting the criteria for any of the Listing of Impairments in the 1.00 series" and that his depression

_____

[11]  At the hearing, Mr. Skryp testified that he had worked for a torch tip manufacturer, as a school janitor, and as a mail sorter. (Tr. 559-560, 562; *see also* earnings report at Tr. 243-245.)  He further testified that the longest period of time in which he worked at any of those jobs was "two, about three weeks, four weeks."  (Tr. 569.)  Social Security regulations state that "work you have done will not show that you are able to do substantial gainful activity if, after working for a period of 6 months or less, your impairment forced you to stop working or to reduce the amount of work you do so that your earnings from such work fall below the substantial gainful activity earnings level."  *See* 20 C.F.R. § 404.1574(c)(1), identifying such experiences as "unsuccessful work attempts."  The ALJ did not address this point in his opinion, but must have concluded that the short-term jobs Plaintiff performed in 1995-1998 were unsuccessful work attempts and therefore did not affect his alleged onset date.

11

and borderline intellectual functioning "do not come close to meeting or equaling the criteria for Listings 12.04 or 12.05." (Tr. 30.)

At step four, having considered the entire record, the ALJ found that Mr. Skryp had the residual functional capacity to perform unskilled light work[12] for the period at issue. (Tr. 40.) He further concluded that due to his postural and non-exertional[13] limitations, Plaintiff could not perform any of his past relevant work as a pipe bender, machine operator, and school janitor, which the vocational expert ("VE") at the hearing, Joseph Kuhar, had described respectively as heavy unskilled, medium semi-skilled, and light unskilled. (Tr. 40; *see also* Tr. 572-573.)

In response to the ALJ's hypothetical questions, Mr. Kuhar had testified there were numerous light-level, unskilled jobs such as

---

[12]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).  A person who is able to do light work is also assumed to be able to do sedentary work unless there are limiting factors such as loss of fine dexterity or the inability to sit for long periods of time. Id.

[13] Exertional limitations are physical limitations, e.g., pain, which affect a claimant's ability to meet the strength demands of a job such as sitting, standing, walking, lifting, etc. 20 C.F.R. § 404.1569a(a). Nonexertional limitations are limitations imposed by impairments affecting one's ability to meet non-strength requirements, for example, nervousness, anxiety, depression, and difficulty concentrating or understanding detailed instructions. 20 C.F.R. § 404.1569a(c).

12

gate guard and packer which an individual of Mr. Skryp's age, education, past relevant work experience, and RFC could perform in the local or national economy, despite his limitations. (Tr. 40; *see also* Tr. 573-574.) Based on Plaintiff's status as a younger individual,[14] his "high school education,"[15] the lack of transferrable skills, and the medical evidence of record, the ALJ concluded that at all times prior to his date last insured, Mr. Skryp was able to perform unskilled work at the light level with certain limitations, i.e., lift and carry no more than 25 pounds;[16] change positions every hour; avoid reaching above his shoulders, twisting and bending; and perform only simple, routine, repetitive tasks which did not require reading or math abilities above the third grade level. Because there were numerous jobs with those limitations available in the national economy which Plaintiff could have performed prior to his date last insured, the ALJ concluded he was not entitled to disability insurance benefits. (Tr. 42.)

---

[14] Plaintiff was 33 years old on May 29, 1990, and 41 on his DLI, making him a "younger" person according to Social Security regulations. 20 C.F.R. § 404.1563(c). Although the ALJ identified Plaintiff's DLI correctly, he found that Plaintiff was "a younger individual between the ages of 45 and 49." This category applies to Plaintiff's age on the date of the hearing (47), but is technically an erroneous finding since that date is irrelevant to this analysis.

[15] Plaintiff testified that he did not complete eleventh grade nor receive a general education degree. (Tr. 559; *see also* Tr. 268.) Theoretically, then, the ALJ erred in this finding, which the Court, however, finds irrelevant to its decision herein.

[16] The Court notes for the record that the definition of "light" work is limited to lifting objects weighing 20, not 25, pounds and frequently carrying objects weighing up to 10 pounds.

13

## B.   Plaintiff's Arguments

On appeal, Mr. Skryp raises eight arguments, many of
which are redundant or overlapping. (Plaintiff's Brief in Support
of Motion for Summary Judgment, Docket No. 15, "Plf.'s Brief," at
18.)    The Court has found three of his arguments worthy of
consideration:

1.   The ALJ failed to properly assess Plaintiff's impairments
     pursuant to SSR 02-1p, "Evaluation of Obesity," as
     directed by the Appeals Council.

2.   The ALJ improperly weighed or mischaracterized the
     medical opinions and evidence of record in violation of
     Social Security regulations and rulings as well as Third
     Circuit law; in other instances, the ALJ apparently
     rejected medical evidence without review or analysis,
     thus preventing effective judicial review.

3.   Because of the previous errors, the ALJ's questions posed
     to the VE failed to include all of Plaintiff's
     limitations supported by the record; thus the answers to
     those questions cannot be considered substantial
     evidence.

1.   *The ALJ's analysis of Plaintiff's obesity and its*
*effect on the severity of his other impairments.*  As noted above,
the Social Security Appeals Council explicitly directed the ALJ on
remand to "reassess the claimant's impairments pursuant to Social
Security Ruling 02-1p."  Stating that he was giving Mr. Skryp the
"maximum benefit of the doubt," the ALJ made the following comments
on this subject:

> I will grant . . . that Exhibit B11F indicates that the
> claimant has obesity, which could have existed prior to
> his date last insured.  However, there is no indication
> in any of the records from Exhibit B1F through Exhibit

14

B10F, the last exhibit before the expiration of the
claimant's date last insured, which indicated that the
claimant had the level of obesity that would interfere
with his ability to perform work within the confines of
his residual functional capacity as found herein.

(Tr. 38.)

The ALJ stated that he could conclude Mr. Skryp's obesity was

a severe impairment prior to December 31, 1998, only by "viewing

all evidence in a light most favorable to him." He then noted:

Indeed, there is virtually no evidence of record
indicating that the claimant's obesity was even a
significant problem prior to the expiration of his date
last insured. However, since the claimant's "obesity"
imposed such limited problems prior to December 31, 1998,
any limitations from the claimant's obesity are clearly
consistent with my finding regarding his residual
functional capacity for the time period prior to December
31, 1998; consequently, "obesity" would not have had any
impact on the jobs that the claimant could have performed
as testified to by the vocational expert for such period.

(Tr. 38.)

Social Security Ruling[17] 02-1p became effective on October 25,

1999, when obesity, per se, was deleted from the Listings after the

SSA concluded the criteria in former Listing 9.09 "did not

represent a degree of functional limitation that would prevent an

individual from engaging in any gainful activity." SSR 02-1p at 1.

However, the Administration recognized obesity as a risk factor

---

[17]    "Social Security Rulings are agency rulings published 'under
the authority of the Commissioner of Social Security' and 'are binding
on all components of the Social Security Administration.'" Sykes, 228
F.3d at 271, citing 20 C.F.R. § 402.35(b)(1). "Rulings do not have
the force and effect of the law or regulations but are to be relied
upon as precedents in determining other cases where the facts are
basically the same." Sykes, id., quoting Heckler v. Edwards, 465 U.S.
870, 873 n3 (1984).

15

which may increase or complicate chronic conditions, including those of the musculoskeletal, cardiovascular, and respiratory systems, and may cause or contribute to mental impairments such as depression. Therefore, the SSA established procedures to be applied when adjudicators found medical evidence of obesity or when it was obvious to the adjudicator that the claimant was obese. Id.

Plaintiff asserts that the ALJ ignored or overlooked evidence in reaching his conclusion that nothing in the record dating from before Plaintiff's DLI "indicated that the claimant had the level of obesity that would interfere with his ability to perform work within the confines of his residual functional capacity as found herein." The Commissioner, on the other hand, argues that the ALJ was correct in finding that Plaintiff's obesity was not a "significant problem" before his DLI. (Defendant's Brief in Support of His Motion for Summary Judgment, Doc. No. 17, at 16.) A thorough review of the record shows that both the ALJ and the Commissioner are mistaken. The following table summarizes in chronological order Plaintiff's reported weights for the period August 1990 through January 1994.[18]

---

[18] Although there are no contemporaneous medical records for the period February 1994 through December 1998, we also note that Dr. Brian Los commented on January 20, 2000, that Mr. Skryp had "maxed out" the doctor's scales at 350 pounds. (Tr. 403.) See also Tr. 424, reporting his weight on July 20, 2000, as 300 pounds; Tr. 432, on September 13, 2000, "greater than 350 pounds;" and Tr. 488, noting that from September 14, 2000 through August 27, 2001, his weight was consistently over 350 pounds.

16

| DATE | EXAMINER[19] | WEIGHT | TR. |
|------|--------------|--------|-----|
| August 15, 1990 | Dr. Richard Hershey | 263 | 209 |
| December 7, 1990 | SSA examiner | 220 | 75 |
| December 11, 1990 | Dr. Hershey | 274 | 150 |
| February 12, 1991 | Dr. R.L. Baker | 255 | 155 |
| February 15, 1991 | SSA examiner | 250 | 83 |
| March 18, 1991 | Dr. Baker | 255 | 162-163 |
| March 19, 1991 | Divine Providence Hospital nursing assessment | 265 | 181 |
| June 26, 1991 | Plaintiff's daily activities questionnaire | 270 | 203 |
| June 22, 1993 | Dr. Baker | 260 | 381 |
| September 20, 1993 | SSA examiner | 270 | 312 |
| January 10, 1994 | Dr. Robert P. Durning | 300 | 370 |

The entries above dated 1990-1991 appear in medical evidence which was presented to the ALJ in connection with Plaintiff's first application for benefits; it is unclear from Judge Bukes's opinion if he considered this evidence in arriving at his conclusions therein. However, the last three entries in the chart are found in Exhibits B-9-F, B-12E, and B-8-F, respectively. Thus, it is not true, as the ALJ stated, that the first evidence of Plaintiff's obesity appears in Exhibit B-11-F, Dr. Los's reports from December 1999 and January 2000.

---

[19] Dr. Richard Hershey performed physical examinations of Plaintiff following his May 1990 injury and provided reports to his employer's insurance company. (Tr. 208-210; 149-151.) The SSA doctors did not physically examine Plaintiff, but noted his weight from their file reviews.

17

According to guidelines published by the National Institutes of Health and relied upon by the SSA, a Body Mass Index ("BMI")[20] of 40 or greater reflects "extreme" obesity which represents the greatest risk for developing obesity-related impairments, although it does not correlate with any specific degree of functional loss. SSR 02-1p at 2. The Ruling provides that the first question to be considered is whether an individual is obese, noting that this can be determined by a diagnosis of obesity given by a treating source or consultative examiner or by derivation from medical records which show a consistently high body weight or BMI. SSR 02-1p at 3. Dr. Baker commented on March 22, 1991, following the discectomy, "He has, of course in the past and now, been advised to lose weight. His secondary diagnosis is obesity, marked." (Tr. 160.) Moreover, as shown in the table above, Mr. Skryp's "weight shows essentially a consistent pattern of obesity." SSR 02-1p at 4.

Once the question of obesity as a cause or contributing factor to impairment comes into play, the ALJ is directed to consider its implications at Steps 2 through 5 of his analysis. SSR 02-1p at 4-

_____

[20] Body Mass Index is the ratio of an individual's weight in kilograms to the square of his height in meters. *See* "Clinical Guidelines on the Identification, Evaluation and Treatment of Overweight and Obesity in Adults," National Institutes of Health Publication No. 98-4083, September 1998, cited in SSR 02-1p at 2. Using an on-line calculator provided by the Centers for Disease Control which determines BMI using pounds and inches (*see* "Tools and Resources" at www.cdc.gov, last visited November 15, 2007), the Court has calculated that given Plaintiff's height of 5 feet 11 inches and his reported weight on various dates between 1990 and 1994 as noted in the chart above, his BMI ranged from 30.7 to 41.8. At 350 pounds, Plaintiff's BMI would be 48.8.

18

6. Although at Step 2 the adjudicator is cautioned that "there is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment," he is directed to "do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe."  Id. at 4.  At Step 3, the ALJ is to determine if obesity, in combination with other impairments, results in a finding that the individual meets or equals a listed impairment.  For example, the ALJ is to consider if the claimant's obesity, in combination with his musculoskeletal impairments, results in the functional equivalent of one of the criteria in Listing 1.00.  The same individualized assessment should be performed if the claimant suffers from mental disorders, cardiovascular, or respiratory impairments.  Id. at 5.

At Steps 4 and 5, when determining a claimant's RFC, the ALJ is to consider the effects of obesity on exertional functions (sitting, standing, walking, lifting, carrying, pushing and pulling), postural functions (climbing, balancing, stooping and crouching), the ability to manipulate one's hands and fingers, and the ability to tolerate extreme heat, humidity or hazards.  The effects of obesity should also be considered in assessing the individual's ability to perform routine movement and necessary physical activity within the work environment on a regular and continuing basis, taking into account the drowsiness, lack of mental clarity, or pain which may accompany severe obesity. SSR 02-

19

1p at 6.

There is no question here that Plaintiff's most obvious impairment was his back problem, which would be analyzed under Listing 1.00, musculoskeletal system. This Listing details how the effects of obesity should be considered in ascertaining impairments to a claimant's musculoskeletal system. It notes:

Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately.

Listing 1.00Q.

The ALJ's failure to recognize evidence of obesity in the record dating from before Plaintiff's date last insured leads in turn to his failure to systematically apply SSR 02-1p and Listing 1.00Q to his analysis of Plaintiff's back impairment. Consequently, his conclusion that even if such obesity existed, it was not sufficiently severe as to impose any limitations which were not already addressed by his finding on Plaintiff's RFC may have been erroneous. Finally, the hypothetical questions posed to the VE at the hearing did not incorporate any non-exertional or postural limitations which might arise from Plaintiff's obesity, raising doubts about the accuracy of the VE's responses to those questions.

We conclude, therefore, that this matter must be remanded for

further consideration of the effects of Plaintiff's obesity on not only his back impairment but also on his overall RFC. *See* similar cases remanded where the ALJ failed to fully explain his assessment of the effect of obesity on the claimant's ability to perform basic work activity, e.g., Przegon v. Barnhart, CA No. 04-5313, 2006 U.S. Dist. LEXIS 8924, *10 (E.D. Pa. Mar. 6, 2006); DeGraphenreed v. Barnhart, CA No. 04-1802, 2005 U.S. Dist. LEXIS 12061, *9 (E.D. Pa. May 26, 2005); and Segal v. Barnhart, 342 F. Supp.2d 338, 341-342 (E.D. Pa. 2004).

2. *The ALJ's treatment of the medical evidence of record:* Plaintiff argues that ALJ improperly mischaracterized or failed to properly weigh medical opinions and other evidence of record, or conversely rejected medical evidence without review or analysis, thus preventing effective judicial review. Because Plaintiff makes these arguments about the ALJ's analysis of the evidence pertaining to his intellectual, psychological, and physical impairments, we will address them in the context of each type of impairment rather than by the ALJ's alleged shortcomings.

a. Intellectual Capabilities. Plaintiff argues that the ALJ erred by not recognizing his mental limitations, particularly his borderline intelligence, which was substantiated by an evaluation for the Office of Vocational Rehabilitation prepared on July 7, 2000, and by a consultative neurophysiological examination on July 9, 2004. Based on this objective testing,

21

Plaintiff argues he was performing "below intellectual expectation [and] suffering neuropsychological problems with functional limitations that would, contrary to the ALJ's findings, impose significant and substantial work limitations." Moreover, Plaintiff argues, although it appears the ALJ apparently accounted for Plaintiff's borderline intelligence by limiting him to work requiring no more than simple, routine, repetitive tasks, he did not analyze the objective evidence and opinions, nor did he explain what he accepted and what was rejected, thereby failing to follow Third Circuit law such as that set out in Reefer v. Barnhart, 326 F.3d 376, 381-382 (3d Cir. 2003). (Plf.'s Brief at 23.)

At the request of the Office of Vocational Rehabilitation, two psychologists, Martin Meyer and Julie Uran, administered a battery of tests to Mr. Skryp on July 7, 2000. (See Tr. 423-428.) In the background portion of their report, Drs. Uran and Meyer noted that Plaintiff stated he had been required to repeat third grade due to poor grades and was a "poor achiever" who found academics difficult. He also said he had dropped out of high school in the eleventh grade to get married and never attempted to earn a GED. Having administered a number of well-recognized tests designed to assess intelligence, educational achievement, and career aptitude, the psychologists opined:

> The cognitive capabilities of this client are measured within the borderline range and academic difficulties involve spelling, reading and primarily include mathematics. Vocational potentials correspond with

skilled versus professional placement.

(Tr. 426.)

Based on the Wechsler Adult Intelligence Scale III test, the doctors concluded that Mr. Skryp's performance IQ was 79, his verbal IQ was 83, and his full scale IQ was also 79, with specific skills sets described as average, low average, borderline, or mildly retarded. (Tr. 425.) They recommended that he work in occupations requiring no more than on-the-job or very short-term specialized training or in a "skilled vocational activity." On the job, Plaintiff would require extended time for learning, individualized instruction, "concrete parameters with structure," and should "avoid work stressors (i.e., stringent deadlines, responsibility, complex directions)." Their recommended vocational domain was "skilled technology - monitoring of gauges or devices, simple assembly, light packaging, food assembly." (Tr. 427.)

On July 9, 2004, Mr. Skryp underwent another examination and battery of tests by psychologist William Fernan at the request of Plaintiff's counsel. (See Tr. 549-554.) Dr. Fernan concluded that Plaintiff functioned in the borderline range, with poor attention and immediate memory, very poor motor speed and sustained attention, extremely poor concentration, very poor spelling skills and "a significant learning disability for mathematics." (Tr. 551-552.) He further noted that Plaintiff had "repeatedly suffered

23

head injuries over the years"[21] in addition to "most likely having some congenital neurological difficulties." (Tr. 552.) He described Plaintiff's prognosis as "extremely poor, given the severity, long term nature and lack of response to treatment of his personal adjustment and cognitive difficulties." (Tr. 553.)

We note first that there is no examination dating from before December 31, 1998, comparable to those performed in 2000 and 2004, nor has the Court been able to identify in other medical reports prior to that date any mention of Plaintiff's intellectual limitations. However, it is reasonable to believe that, generally speaking, an individual's intellectual functioning does not vary over time, barring some traumatic event which injures the brain itself. We therefore infer, based on the psychologists' reports, that Plaintiff functioned at a borderline intelligence level prior to, as well as after, 2000 when the first examination was performed. But, based on the record, it is clear that despite his intellectual limitations, Mr. Skryp had worked approximately twelve years at heavy manual labor (Tr. 549) then, following his accident

---

[21] In the interview with Dr. Fernan, Plaintiff reported being struck on the head by a brick at age 7 or 8, hitting his head on a jack hammer during a bicycle accident at about the same age, hitting his chin on the ground as the result of another bicycle accident at age 10, falling from a cliff approximately 40 feet high, and running into a parking meter with his head at age 13 while playing street football. (Tr. 550.) Working from Plaintiff's birthdate of May 1957, these events would have occurred in the late 1960s. Not surprisingly, therefore, the record does not contain substantiating contemporaneous medical reports. On the other hand, these incidents are not mentioned anywhere else in Plaintiff's medical history until this interview.

24

in 1990, had worked as a mail package sorter (which could be reasonably assumed to require at least rudimentary reading skills), as a semi-skilled machinist, and as a janitor. Nothing in the record, including Plaintiff's testimony about those jobs, implies that he could not perform them because of his intellectual limitations, although he admitted he might have "messed up some material" as a machinist because he did not understand how to use a drill press properly. (Tr. 564.) Moreover, despite Plaintiff's argument that the ALJ failed to take into account his intellectual limitations and lack of education, Judge Bukes specifically included in his hypothetical questions to the vocational expert a restriction to "simple, routine, repetitive tasks" and reading and mathematics requirements limited to "the third grade level." (Tr. 573-574.) We therefore find no merit to Plaintiff's argument that the ALJ failed to take into account his intellectual limitations in his ultimate determination that there were a significant number of jobs in the economy which Plaintiff could perform.

Neither are we persuaded by Plaintiff's alternative argument that the ALJ failed to explain which part of this evidence he accepted or rejected. To the contrary, the opinion is very clear on this issue. The ALJ rejected the findings of Drs. Uran and Meyer because their report was dated two years after Plaintiff's DLI and did not "contain any evidence which would relate back to a time period prior to December 31, 1998." The ALJ gave their report

25

"very little weight since it is basically entirely conclusory." He rejected Dr. Fernan's report because "there is no way, based on reasonable medical certainty, that any problems noted in July of 2004 could reasonably relate back to a time prior to December 31, 1998." (Tr. 39.)

We disagree with the ALJ that the report by Drs. Uran and Meyer was "entirely conclusory" because the evidence regarding Plaintiff's intellectual capabilities is based on objective, well-recognized tests. We also disagree with his conclusion that neither report contains evidence which would relate back to the period before December 31, 1998. We conclude, however, that there is no reason to remand for reconsideration of these decisions because the ultimate outcome would be the same; that is, Plaintiff's intellectual capacity, considered alone or in combination with his other impairments, was not so severe as to preclude him from substantial gainful employment. *See* Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005), declining to remand for analysis of the claimant's obesity which the ALJ had omitted because such analysis would not affect the outcome of the case.

                b.    Depression.    Plaintiff argues that the evaluations in 2000 and 2004 show that his severe mental limitations relate back to at least 1994. The report by Drs. Uran and Meyer noted the onset of depression in 1994 and diagnosed him

26

with bipolar disorder I,[22] along with other diagnoses which imposed substantial functional limitations. Dr. Fernan's evaluation specifically relates back in time, based on his history, review of historical medical evidence, and the report of Drs. Uran and Meyer. According to Plaintiff, Dr. Fernan "specifically opined that [his] multiple organic and mental health problems were totally work precluding by at least 1998." (Plf.'s Brief at 23, *citing* Tr. 552.[23]) Again, Plaintiff argues, the ALJ failed to analyze this evidence and to explain what he accepted or rejected.

In their report, Drs. Meyer and Uran noted that according to his self-reported history, Mr. Skryp's depression began in approximately 1994. As of July 2000 his symptoms included isolation, refusal to socialize and poor social interactions; feelings of sadness, emptiness, worthlessness, and inappropriate guilt; loss of interest in most activities; significant weight

---

[22] Bipolar disorder is characterized by periods of excitability (mania) alternating with periods of depression. There are two primary types of bipolar disorder. Bipolar disorder I (formerly called manic depression) is characterized by at least one fully manic episode with periods of major depression. People with bipolar disorder II seldom experience full-fledged mania, but instead experience periods of hypomania (elevated levels of energy and impulsiveness that are not as extreme as the symptoms of mania) which alternate with episodes of major depression. *See* the medical encyclopedia at Medline Plus.

[23] We note that Dr. Fernan actually wrote, "With his combination of difficulties he has not been able to engage in any competitive employment since 1998." (Tr. 552.) The combination of difficulties cited by Dr. Fernan include "depression, significant anxiety and avoidance" following his 1990 injury, the existence of which, as discussed in the text above, is not supported by contemporaneous medical records.

27

gain; psychomotor agitation daily; fatigue or loss of energy; diminished ability to think, concentrate, recall, or sustain focus; suicidal ideation (but no concrete attempts); and severe mood swings, leading to intense anger, violence, and marital problems resulting in divorce. However, he had never received any hospitalization, psychiatric evaluation, counseling, or medication for any of these problems. (Tr. 423-425.)

The doctors opined that Plaintiff's functional limitations included poor impulse control, likelihood of difficulty interacting with others, and an inability to accommodate work stressors. They recommended that he receive "psychiatric consults" and noted that his vocational rehabilitation would be contingent on improvement in his emotional functioning. They diagnosed Mr. Skryp with bipolar disorder I and noted that his GAF was 55.[24]

It is clear from the context of their notes that Drs. Uran and Meyer gathered this information from Mr. Skryp, based on the use of

---

[24] The Global Assessment of Functioning or GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n.2 (D. Del. Apr. 18, 2002). A GAF rating between 51 and 60 reflects "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social [or] occupational . . . functioning (e.g., few friends, conflicts with peers or co-workers)." See the on-line version of DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited November 12, 2007. A GAF score is only one factor an ALJ must consider in determining a claimant's disability due to mental limitations. See Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

28

phrases such as "Michael states," "client reports," and "client admits." (Tr. 424.) There is no evidence that the doctors relied on any earlier medical evidence which would confirm their statement that Plaintiff's depression began as early as 1994, and the Court has been unable to identify such evidence from its own review of the record, except for Plaintiff's testimony at the hearing that his emotional problems began as a child and became more serious in 1994 or 1995.[25] (Tr. 570.) In fact, Plaintiff's application for DIB completed in November 1999 states that he was disabled due to lower back surgery, arthritis, mitral valve prolapse, and a "hump" at the base of his neck, but nothing in that application, including a detailed accounting of his symptoms, even alludes to depression or depressive symptoms. (Tr. 261-269.)

Dr. Fernan's report from July 2004 is equally unpersuasive to show that Plaintiff's depression was severe prior to his DLI. The psychologist described Plaintiff as "not overly anxious," but with a flat, depressed affect. He was able to maintain good eye contact and his speech was spontaneous and normal. (Tr. 549.) His significant other, who accompanied him to the examination, reported that he had difficulty maintaining attention and was very

---

[25] We do note that in 1990 through 1994, Dr. Baker prescribed Trazodone, an antidepressant, and Elavil (amitriptyline hydrochloride) which can be used to treat either depression or chronic pain. (*See* Tr. 382, 377; *also* drugs and supplements entries at Medline Plus.) Curiously, nowhere in Dr. Baker's notes does he state why he prescribed these drugs, and the Court cannot definitively conclude they were prescribed for depression without further explanation.

forgetful. (Tr. 550-551.) Plaintiff reported that "severe mood swings" began by the time he was 8 years old, with many days when he would feel "great" alternating with periods of being easily angered, engaging in physical altercations, verbally acting out, and withdrawing from friends and family. "Significant depression" began when he was diagnosed with rheumatic fever [about age 12] and was "severely exacerbated by his back injury." He reported that he had gone to a regional counseling center for individual psychotherapy and was prescribed Effexor XR and Mirtazapine.[26] Despite this treatment, he continued to experience mood swings with moderate depression, including near-tearfulness, severe insomnia, excessive appetite, lack of sex drive, difficulty initiating and enjoying activities most of the time, easy irritation, significant withdrawal, and constant worry and anxiety, particularly in public places. (Tr. 551.)

The results of two objective tests, a review of the report by Drs. Uran and Meyer, and the psychologist's own observations led Dr. Fernan to conclude Plaintiff had developed "significant symptoms of a bipolar disorder at a young age;" his "poor cognitive ability" and rheumatic fever had "exacerbated his bipolar disorder;" his injury in 1990 had resulted in "further exacerbation

---

[26] Both Effexor (venlafaxine) and Mirtazapine are antidepressants. In its extended release ("XR") form, venlafaxine is also used to treat generalized anxiety disorder, social anxiety disorder, and panic disorder. See drugs and supplements entries at Medline Plus.

of his depression, significant anxiety and avoidance" despite his attempts to return to work. (Tr. 552.) Dr. Fernan's psychiatric diagnoses were bipolar disorder I, anxiety disorder, attention-deficit/hyperactivity disorder (predominantly inattentive type), mathematics disorder, and disorder of written expression (spelling.) Plaintiff's GAF at that time was diagnosed as 50. Dr. Fernan concluded Mr. Skryp's prognosis was

> extremely poor, given the severity, long term nature and lack of response to treatment of his personal adjustment and cognitive difficulties. Appropriate treatment would be seen as continued individual psychotherapy and pharmacotherapy. Treatment would be seen as mainly for maintenance, with little progress being seen.

(Tr. 553.)

Dr. Fernan also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) in which he concluded that Plaintiff had poor or no ability to make most occupational, performance, or personal-social adjustments. (Tr. 547-548; 554.)

The most significant new information in Dr. Fernan's report is that Plaintiff had received individual psychotherapy and medication at a counseling center. However, the records from this counseling service date only from September 14, 2000, through August 27, 2001, well after Plaintiff's date last insured. (Tr.453-463; 477-481.) This first date is consistent with the report by Drs. Uran and Meyer that as of July 2000, Plaintiff had not received any psychiatric evaluation, counseling, or medication. No mention of earlier psychological counseling appears anywhere in the record.

31

Again, Dr. Fernan's diagnosis of depression prior to December 31, 1998, appears to be based only on Plaintiff's own reports and on the July 2000 diagnosis, which in turn was based only on Plaintiff's reported history. We further note that contrary to Plaintiff's argument, the ALJ did mention the reports from 2000 and 2004 in discussing Plaintiff's depression, but stated that they were given very little weight because there was no evidence therein which would relate back to the period prior to Plaintiff's date last insured. (Tr. 39-40.)

Assuming for the sake of argument that Plaintiff did experience depression from childhood, his contention that it was a severe impairment is belied by the facts that he was able to work for many years despite this condition (including his unsuccessful work attempts between 1995 and 1998) and he never identified depression as a reason he was unable to adequately perform those jobs. We also find significant the fact that he denied any depression or anxiety during his examination by Dr. Los on January 14, 1999. (Tr. 407.) It is not enough that a claimant for Social Security benefits be diagnosed with an impairment; there must be evidence that it was sufficiently severe to preclude any form of substantial gainful employment. Walker v. Barnhart, No. 05-2282, 2006 U.S. App. LEXIS 5719, *8 (3d Cir. Mar. 6, 2006) ("Mere presence of a disease or impairment is not enough. A claimant must show that his disease or impairment caused functional limitations

that precluded him from engaging in any substantial gainful activity"), *citing* Alexander v. Shalala, 927 F. Supp. 785, 792 (D. N.J. 1995), *aff'd w/o opinion*, 85 F.3d 611 (3d Cir. 1996)(*per curiam*). We conclude that the ALJ did not err by finding that Plaintiff's psychological impairments, alone or in combination with his other conditions, were not disabling at any time prior to his date last insured.

            c. Back disorder. Plaintiff raises a number of intermingled arguments with regard to the impairment caused by his back injury. To the best of the Court's ability to unravel them, Plaintiff first argues that the ALJ failed to fully consider medical evidence from 1999 through 2004 to the extent that those reports "relate back" to his condition between September 1994 and his DLI. (Plf.'s Brief at 20.) Second, he argues that the ALJ erred by focusing his analysis of Dr. Baker's records on the period 1990-1991, immediately following Plaintiff's surgery, while failing to recognize that two vehicular accidents in 1991 and 1993 exacerbated his condition. (Plf.'s Brief at 22.) Finally, he argues that evidence from after December 31, 1998, is consistent with reports by Drs. Baker and Durning as to the severity and effects of his back impairment and shows that during the 1994-1998 interval, his condition did not improve. (Id.) Because we find that the ALJ erred at numerous points in his review of evidence dating from 1990 through 1994, we need not address the question of

33

the extent to which evidence from 1999 through 2004 relates back to the earlier evidence or supports the findings of Drs. Baker and Durning.[27] The ALJ should, however, consider this question on remand in determining Plaintiff's disability onset date prior to December 31, 1998, if indeed, the evidence supports such a determination.

As noted above, following his surgery in March 1991,[28] Mr. Skryp returned to work with numerous limitations which he and/or his employer did not observe. When he was injured in the first vehicle accident on September 13, 1991, he returned to Dr. Baker complaining of continuing lower back pain, occasional radicular pain in his left leg, and intermittent numbness. (Tr. 386.) An MRI of his lower back on December 20, 1991, showed no recurrent herniation. (Tr. 385.) When Dr. Baker examined him again in February 1992, Plaintiff reported that he had "pulled his back three times. . . mostly at home doing odd jobs and playing with his children." (Tr. 384.) He had not been taking medication which was "not helpful anyhow" and Dr. Baker told him that the prescribed

---

[27] We do note for the record that Plaintiff appears to be correct in his argument that evidence about the severity of his back disorder after the April 1993 accident is confirmed by a CT scan performed on November 14, 2000, and its interpretation on November 30, 2000, by Dr. Garrett Dixon, stating "he does have a disc herniation at the L4-5 level." Compare Dr. Baker's diagnosis at Tr. 380 with Tr. 440 and 448.

[28] Although the ALJ refers to "back surgeries" (see Tr. 30, 32 and 33, the last referring to surgery in January 1991), to the best of the Court's ability to determine, Mr. Skryp underwent only one such surgery, on March 19, 1991.

34

medications "would never give him long term relief." (Id.) Mr. Skryp had not been compliant with hydrotherapy which Dr. Baker recommended previously, but had been using moist heat, stretching exercises and walking. On June 11, 1992, Dr. Baker commented that Plaintiff was having "no real radicular leg pain" and that "this is the best I have seen his legs since surgery." His outlook for Plaintiff to perform light to moderate duty work could be described at that time as extremely positive. (Tr. 383.)

However, as Plaintiff asserts, the picture changed after his second automobile accident in April 1993. Following an exam on May 27, 1993, Dr. Baker diagnosed him with acute lumbar strain and exacerbation of his chronic lumbar problem. (Tr. 382.) Plaintiff was scheduled to return to Dr. Baker on July 8, but returned a month earlier after he twisted his foot while taking out the trash and injured his back again. (Tr. 381.) He was sleeping poorly, complaining of pain in his left leg from the buttock to the heel, and occasional numbness in his toes; he walked with "some limp" in the left supportive gait phase. Dr. Baker continued his prescription of Trazodone and asked him to try Trilisate because Feldene had not helped him in the past.[29]  (Tr. 381.)

---

[29] Trazodone is used to treat depression and works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. It is also sometimes used to treat schizophrenia, anxiety, alcohol abuse or other conditions and to control abnormal, uncontrollable movements that may be experienced as side effects of other medications. Trilisate (choline magnesium trisalicylate) is used to relieve pain, tenderness, inflammation, and stiffness caused by arthritis, to relieve general pain, and to lower

35

During the next examination, Dr. Baker reported "clear cut radicular pain down into the foot with what appears to be an L 4-5 left radiculopathy." He noted pain on straight leg raising bilaterally, pain in the left paravertebral musculature in the region of his surgery, and decreased strength on plantar flexion and dorsiflexion. Dr. Baker suggested that if Plaintiff experienced no improvement from water therapy and continued medication, "he should seriously consider repeat myelography." His impression on August 3, 1993, was that of "probable recurrent herniated nucleus pulposus L-4-5 left." (Tr. 380.)

In late August, Dr. Baker withdrew his recommendation for the repeat diagnostic myelogram after Mr. Skryp advised him that he did not want to proceed with any additional surgery. (Tr. 378.) When Plaintiff reported increased pain in his left leg in November 1993, Dr. Baker continued conservative treatment (moist heat, walking, and weight reduction), but reiterated that additional surgery might be needed if the radicular pain continued. (Tr. 377.)

On February 1, 1994, Dr. Baker wrote in relevant part:

> Mr. Skryp is still walking with a noticeable limp. He is unable to sit for more than 20 minutes at a consecutive period of time. . . . He is continuing to have recurrent left leg radicular pain. However, it is not as severe even as November which was improved from August of 93. .

fever. Feldene (piroxicam) is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis or rheumatoid arthritis. Both Trilisate and Feldene are in a class of medications called nonsteroidal anti-inflammatory drugs ("NSAIDs") which work by stopping the body's production of a substance that causes pain, fever, and inflammation. See drugs and supplements entries at Medline Plus.

. .It is my impression that Mr. Skryp was originally injured at work and has been reinjured since his surgery. . . . I believe that his only chance of returning to work is with marked restriction: (1) no lifting greater than 10 lbs. (2) no bending at the waist (3) changing position on a 1/2 hourly basis. . . . He is not as well as he was in the immediately post-operative period when I had returned him [to work] with much less restrictive positions in February of '92. He was also told to work on weight loss with daily activity.

(Tr. 376.)

After yet another injury to his back in March 1994, Plaintiff experienced "severe pain down both legs" and "severe spasm in the lower back" for three or four days. Dr. Baker reiterated the same restrictions as noted in February, as well as his opinion that medication and water therapy would only give him "palliative temporary relief." (Tr. 375.) A follow-up exam on June 16, 1994, showed continued pain bilaterally on straight leg raising, spasms on palpation of his lower back (which had decreased from the previous exam), and decreased reflexes in his left Achilles tendon. His strength seemed uniform as compared to the previous exam when he had some weakness in the left leg as compared to his right. (Tr. 374.)

Dr. Baker's last note is from September 8, 1994. He indicated that Plaintiff had experienced "persistent left leg pain since the motor vehicular accident" and continuing, intermittent severe pain in his ankle. Dr. Baker refilled his prescriptions of Parafon

Forte and Relafen[30] which provided some relief. He repeated his diagnosis of a recurrent herniated nucleus pulposus at L4-L5 and/or L5-S1, left greater than right. (Tr. 373.)

We agree with Plaintiff that the ALJ concentrated on the reports by Dr. Baker for the period May 1990 through May 1991 and failed to give adequate consideration to evidence that his back disorder continued to deteriorate after the second automobile accident in April 1993. This becomes especially critical because the ALJ relied extensively on Dr. Baker's report of May 23, 1991, which included four specific findings with regard to Plaintiff's ability to work, i.e., (1) lifting limited to 25 pounds; (2) no bending at the waist; (3) changing positions hourly; and (4) no driving for more than one hour at a time. (Tr. 35; see also Tr. 394.) He also relied on Dr. Baker's findings from February 20, 1992, that Plaintiff had continued to improve and was limited only by lifting less than 50 pounds, no bending, twisting or repetitive actions at the waist, no reaching above the shoulders, working between the waist and shoulders at all times, changing positions hourly, and no driving for more than one hour. (Tr. 36, see also Tr. 384.) However, the ALJ fails to address the limitations Dr.

---

[30] Parafon Forte (chlorzoxazone) is used in combination with physical therapy, analgesics, and rest to relieve pain and stiffness caused by muscle strains and sprains. Relafen (nabumetone) is another NSAID. See drugs and supplements entries at Medline Plus. The evidence that Plaintiff was prescribed at least six medications for pain (and perhaps depression) in 1990-1994 contradicts the ALJ's finding that Plaintiff "never received any prescriptive pain medication or narcotic pain medication." (Tr. 32.)

Baker imposed *after* the April 1993 accident and *after* some nine months of treatment for the exacerbation of his back disorder from that accident, i.e., no lifting greater than 10 pounds, no bending at the waist, and changing positions every half hour. (Tr. 375-376.) While an ALJ may accept some medical evidence and reject other parts, he must consider all the evidence and provide cogent reasons for discounting the evidence he rejects, particularly when that evidence suggests a contrary disposition. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994). Where the ALJ fails to address significant medical evidence or fails to provide a comprehensive and analytical explanation of his conclusions, the reviewing court is unable to determine "if significant probative evidence was not credited or simply ignored." Burnett v. Commissioner of SSA, 220 F.3d 112, 121 (3d Cir. 2000)(internal quotation omitted.)

The ALJ did address Dr. Baker's notes from September 8, 1994, in which he stated that his impression of Plaintiff's back disorder at that time was a recurrent ruptured disc. (Tr. 37, *see also* Tr. 373.) The ALJ commented, however, that "there is not even any further discussion of any problems regarding any significant recurrence of a herniated disc in at [sic] any other time in September 1994." More importantly, he concluded that the "recurrent herniated disc problem was entirely acute and short lived" and that "in all likelihood, Dr. Baker misdiagnosed the claimant's apparent recurrent herniated disc in September 1994"

39

because there is no other evidence of record to support his findings. (Tr. 37.)

We find this analysis both factually inaccurate and contradictory to well-established Third Circuit law. The statement that Plaintiff's herniated disc problem in September 1994 was only "short-lived" is clearly inaccurate since Dr. Baker had been referring to this diagnosis since at least August 3, 1993. (*See* Tr. 380, 378, and 376.) Moreover, Dr. Baker, a specialist in neurosurgery, was Plaintiff's treating physician from shortly after his accident in May 1990 through September 1994. The "opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight," particularly where those opinions discuss the "nature and severity" of the impairment. Fargnoli, 247 F.3d at 43, *citing* 20 C.F.R. § 404.1527(d)(2). This is especially true where the opinions "reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Morales, 225 F.3d at 317. An ALJ may reject a treating physician's opinion only "on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Morales, id. Here, the ALJ has failed to identify,[31] and the Court's own review

---

[31] We note that, contrary to the Appeals Council's directive that he should consider SSR 96-2p, "Giving Controlling Weight to Treating Source Medical Opinions" and SSR 96-5p, "Medical Source Opinions on Issues Reserved to the Commissioner," the ALJ failed to explain the weight he gave to the opinions of Drs. Baker or Durning except to note that they were, in part, consistent with his own findings.

is equally unsuccessful in finding, any medical evidence to contradict Dr. Baker's diagnosis. *See* <u>Bordes v. Comm'r of Soc. Sec.</u>, 2007 U.S. App. LEXIS 11709, *31-*32 (3d Cir. 2007), finding that the ALJ had erred by rejecting a treating physician's diagnosis based on his own speculation that the claimant's condition could not have been too serious if she experienced "'some relief' from anti-inflammatory medication" and failed to go to physical therapy when advised to do so; <u>Holmes v. Barnhart</u>, CA No. 05-5214, 2006 U.S. Dist. LEXIS 79826, *24-*25 (E.D. Pa. Nov. 1, 2006), remanding where ALJ failed to cite medical evidence to contradict the treating physician's descriptions of the claimant's limitations and impermissibly substituted her own lay opinion that the physician's opinions were "unrealistic;" and <u>Clark v. Barnhart</u>, CA No. 02-1238, 2003 U.S. Dist. LEXIS 12215, *28 (E.D. Pa. June 19, 2003), remanding in part because the ALJ had made "speculative inferences" about the meaning of diagnostic tests.

The ALJ also misconstrued the other significant medical evidence concerning Plaintiff's back impairment dating from before his DLI, that is, Dr. Durning's consultative report of January 10, 1994. (Tr. 369-372.) The physician first summarized the medical history and symptoms which are largely consistent with those described by Dr. Baker in his notes of November 1993 and February 1994. (*Compare* Tr. 369 with Tr. 376-377.) Dr. Durning's diagnosis was of low back and left leg pain. He concluded:

41

> In my opinion, Mr. Skryp is in a state of "semi-acute"
> low back derangement and is not fit for any activity
> other than part-time sedentary activity at this time. I
> am not optimistic . . . that he could perform full-time
> work of a sedentary or office nature because of the
> prolonged sitting. He is unable to perform prolonged
> walking and cannot be expected to lift, bend or twist as
> might be required of some forms of light work.

(Tr. 371-372.)

Based on this report, the ALJ reached several conclusions.
First he found that Dr. Durning's comment that Plaintiff's back
surgery had healed "without complication" was consistent with his
own finding that despite Mr. Skryp's surgery, he could perform
light work with certain postural limitations. (Tr. 35, *see also*
Tr. 370, noting that there was no evidence of drainage, infection
or induration at the healed midline scar.) Although Plaintiff had
initially experienced some infection at the incision cite (*see* Tr.
193-195[32]), he did not allege he was impaired as a result of this
temporary problem. Therefore, it is unclear to the Court how Dr.
Durning's report of a well-healed incision site, *per se*, supports
the ALJ's conclusion that Plaintiff could perform light work.

Second, the ALJ acknowledged Dr. Durning's discussion
regarding aggravation of Plaintiff's back disorder from the motor
vehicle accident in April 1993, but noted that this event had
occurred "nearly two years after May 1991, the month in which the

---

[32]    These documents are also part of the medical record submitted
in support of the initial application, but are not explicitly referred
to by the ALJ in the decision now under review.

claimant had to establish a one-year long disability." (Tr. 35.)
This statement reflects an apparent misunderstanding of the
relevant law by the ALJ. That is, in order to qualify for DIB, Mr.
Skryp had to establish that, prior to the date on which he was last
insured, he had become disabled as the result of a medically
determinable physical or mental impairment which could be expected
to result in death or which lasted for a continuous period of not
less than 12 months. 20 C.F.R. §§ 404.131; 404.1505. Although the
ALJ identified the "period at issue" herein as May 29, 1990,
Plaintiff's alleged onset date, through December 31, 1998, the date
last insured, he repeatedly referred to Plaintiff's failure to
establish that he was continuously disabled during the period May
29, 1990, through May 29, 1991, failing to consider that the total
body of medical evidence could potentially show that Plaintiff was
continuously disabled beginning, for example, April 30, 1993, the
date of the second automobile accident, or some point thereafter,
but before his date last insured, thus entitling him to DIB.[33]

---

[33]    The Court explicitly declines to proffer any speculation on
whether this hypothesis is true or not. We note for the record that
the decision denying Plaintiff's first application for DIB, handed
down on January 28, 1992, would preclude an onset date prior to
January 29, 1992, unless ALJ Bukes re-opened that case, which he
explicitly declined to do (Tr. 28) or engaged in a *de facto* opening.
*See* Young v. Bowen, 858 F.2d 951, 955-56 (4th Cir. 1988) (an ALJ's
in-depth analysis of the nature of a claimant's disability during the
period covered by a prior determination is sufficient basis for a
reviewing court to find a *de facto* reopening.) Plaintiff does not
argue, however, that the ALJ performed a *de facto* re-opening of his
case and the Court declines to make this argument on his behalf.   *See*
SSR 83-20, "Onset of Disability," discussing how the ALJ is to
determine the claimant's onset date when the evidence shows that the

43

Third, the ALJ relied on Dr. Durning's review of a lumbar myelogram performed on September 17, 1990, to support his assertion that the consulting physician's "overall report" was consistent with his own RFC finding. (Tr. 36.) According to Dr. Durning's notes, the September 1990 report described a "slight anterior defect at L4-L5 and decreased filling of the S1 nerve roots" while the post-myelogram described a "moderate central bulge of the L5-S1 disc." (Tr. 371.) Dr. Durning did not personally examine any films from the test (none were provided), and appears to have been simply summarizing the report,[34] not making a diagnosis. (*See* Tr. 124-125.) Moreover, taken as a whole, Dr. Durning's conclusion – that Plaintiff could not perform even sedentary work on a full-time basis – is not consistent with the ALJ's determination that Plaintiff could perform light work with certain postural and non-exertional limitations. The ALJ rejected Dr. Durning's conclusion on the basis of Dr. Baker's comment that Plaintiff could perform work at the light level if he were permitted to alternate sitting and standing on an hourly basis. (Tr. 36.) As discussed above, this conclusion by Dr. Baker was made before the April 1993

---

impairment(s) may have existed but were not necessarily disabling on the date proposed by the claimant, and Guerrero v. Comm'r of Soc. Sec., CA No. 05-1709, 2006 U.S. Dist. LEXIS 71259, *12-*16 (D. N.J. June 19, 2006), describing how the ALJ applied SSR 83-20 in the context of a gradually worsening mental impairment.

[34] The narrative reports of September 12, 1990, concerning the myelogram and CT scan are included at Tr. 122-132, but were apparently not considered by the ALJ since they were provided only in connection with the first application.

accident. By contrast, on February 1, 1994, i.e., within weeks of Dr. Durning's January 10, 1994 conclusion, Dr. Baker had also limited Plaintiff to work which allowed him to change position every half hour and did not require lifting more than 10 pounds, the latter restriction being consistent with sedentary, not light, work. *See* 20 C.F.R. § 404.1567(a).

We conclude, based on the ALJ's evaluation of the reports by Drs. Baker and Durning, that (1) the ALJ misconstrued critical points from their reports, (2) improperly relied on his own lay opinion rather than Dr. Baker's August 3, 1993 diagnosis of a recurrent herniated disc, and (3) failed to consider if their reports between April 1993 and September 1994 could have established that Plaintiff was disabled at that time, or at least limited to sedentary rather than light work. This matter must therefore be remanded for further consideration of these questions.

3. *The ALJ's hypothetical question to the Vocational Expert:* Mr. Skryp raises this as an error, stating that "the ALJ's dis-entitling hypothetical fails to include all of [his] limitations as supported by the record." (Plf.'s Brief at 18.) Plaintiff fails to develop this argument at any point in his brief and therefore we do not dwell on it at length. We agree, however, that the hypothetical questions posed to the VE did not include limitations which may have been imposed by Plaintiff's severe obesity, nor did the answers to those questions identify any

sedentary occupations, the category to which Plaintiff would have been limited had the ALJ adopted the later opinions of Drs. Baker and Durning.[35]

As is well-established, in posing a hypothetical question, the ALJ "must accurately convey to the vocational expert all of a claimant's credibly established limitations." Rutherford, 399 F.3d at 554; *see also* Burns, 312 F.3d at 123, noting that if "undisputed evidence of specific impairments [is] not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence." On remand, should further hypothetical questions be required, the ALJ should incorporate all limitations which his review of the evidence determines have been credibly established.

_____

[35]  For the record, the Court questions the VE's testimony that the job of gate guard (DOT 372.667-030) could be performed by a claimant with the characteristics posed in the ALJ's hypothetical questions. According to the *Dictionary of Occupational Titles* ("DOT"), although that job is rated as light, it is considered semi-skilled, not unskilled, as indicated by a specific vocational preparation ("SVP") rating of 3. *See* Burns, 312 F.3d at 126 ("the Social Security Administration has taken administrative notice of the reliability of the job information contained in the [DOT];" Boone v. Barnhart, 353 F.3d 203, 207 (3d Cir. 2003), noting that SVP ratings of 3 and 4 are associated with semi-skilled work. Regarding the "packer" job identified by the VE, some 14 variations of "packer" appear in the DOT, only two of which satisfy the criteria for light unskilled work, i.e., packer of fireworks (DOT 737.687-094) and packer of tobacco products (DOT 920.685-082); all others are ranked as medium and/or semi-skilled. The Court views with great skepticism the VE's testimony (Tr. 573) that 1,700 such jobs exist in the six counties comprising the northwest tier of Pennsylvania. *See* job descriptions at DOT, revised 4th edition, provided by the U.S. Department of Labor at www.occupationalinfo.org (last visited November 16, 2007.)

46

## V.  FURTHER PROCEEDINGS

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." <u>Krizon v. Barnhart</u>, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), *quoting* <u>Podedworney v. Harris</u>, 745 F.2d 210, 222 (3d Cir. 1984).

This Court is cognizant that its role does not include a re-weighing of the evidence presented to the ALJ. However, our role does extend to "considering the evidentiary record as a whole, not just the evidence that is consistent with the agency's findings." <u>Monsour Medical Center</u>, 806 F.2d at 1191. We must also determine if the ALJ properly applied the law, "a cardinal principle" of which is that "the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." <u>Morales</u>, 225 F.3d at 317 (internal citations and quotations omitted). Another such principle is that the ALJ may "reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." <u>Id.</u>

47

Here, we find that the ALJ failed to observe either of these principles. Nor did the ALJ comply with the Appeals Council directive that he perform the "individualized assessment" of Plaintiff's obesity pursuant to SSR 02-1p.

Plaintiff argues that "remand would serve no purpose" and seeks an order of Court reversing the ALJ and awarding disability insurance benefits. (Plf.'s Brief at 24-25.) However, rather than award benefits by imposing our own conclusions about the severity of Plaintiff's disability and its proper onset date, we believe the case must be remanded for further consideration of the effect (if any) of Plaintiff's obesity and to allow the ALJ to explain his treatment of the medical opinions, particularly those of Drs. Baker and Durning dating from April 1993 through December 1994.

An appropriate order follows.

November __/9__, 2007

_William L. Standish_
William L. Standish
United States District Judge

cc: Counsel of Record

48